## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THE BOYD GROUP (U.S.) INC.,      )
                                 )
         Plaintiff,          )
                                 )     Case No. 14 CV 7751
         v.                        )
                                 )     Judge Robert M. Dow, Jr.
ROGER A. D'ORAZIO JR.,        )
                                 )
         Defendant.         )

## MEMORANDUM OPINION AND ORDER

This action involves several disputes arising from an April 14, 2014 transaction in which Plaintiff The Boyd Group (U.S.) Inc. ("Boyd") acquired Defendant Roger D'Orazio's shares in two entities that own collision repair centers in Illinois, Indiana, and Florida. Boyd initiated the lawsuit on October 3, 2014, and soon thereafter filed a motion for a preliminary injunction [7]. The parties resolved one of their disputes related to sign permit applications, see [21], Joint Stipulation ¶¶ 1–3, after which Boyd voluntarily dismissed Counts VII and VIII of its amended complaint, see [30]. Currently pending before the Court are two motions to dismiss. In the first motion [15], D'Orazio moves to dismiss Counts I through V and Counts IX and X of Boyd's amended complaint [6]. In the second motion [53], Boyd moves to dismiss Counts I, III and IV of D'Orazio's amended counterclaim [43]. D'Orazio also has moved for summary judgment on Count I of his amended counterclaim and on Count VI of the amended complaint. See [27]. The parties currently are conducting discovery on that motion. See [60, 72].

For the reasons set forth below, the Court grants in part and denies in part the pending motions to dismiss, as follows. The Court grants D'Orazio's motion to dismiss [15] with respect to Counts I through V and X and denies it with respect to Count IX. The Court grants Boyd's

motion to dismiss Mr. D'Orazio's amended counterclaim [53] in full, with the exception of subsection (a) of Count III, which alleges that Boyd breached the parties' agreement by failing to deliver its post-closing WIP Adjustment figure in the time frame provided by the agreement. All of the dismissals are without prejudice. If the parties believe that they are able to amend their pleadings to state valid claims, they may do so within 28 days of the date of this order.

## I.    Background

The facts are drawn from Boyd's amended complaint [6] and from D'Orazio's amended counterclaim [43]. For purposes of deciding the pending motions to dismiss, the Court assumes as true all well-pleaded allegations set forth therein. See *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Boyd is a Delaware corporation with its principal place of business in Delaware. [6], Am. Compl. ¶ 2. It is the largest operator of collision repair centers in North America. [43], Am. Counterclaim ¶ 3. D'Orazio is a citizen and resident of Florida and was the sole shareholder of Dora Holdings, Inc., a corporation that owned Collision Revision, Inc. and Collision Revision 13081, Inc. [6], Am. Compl. ¶¶ 3, 6, 7. D'Orazio's business was a "leader[] in the collision repair industry"; he owned 29 production facilities and had six satellite offices and over 300 employees. [43], Am. Counterclaim ¶ 2. In early 2014, Boyd became interested in acquiring D'Orazio's business, and the parties entered into a Purchase and Sale Agreement (the "PSA") for his stock. See *id.* at ¶¶ 3, 5.

**The PSA and the Post-Closing Adjustments**

Under the PSA, the preliminary purchase price of the stock was $32.5 million, subject to certain post-closing adjustments, including a "Working Capital Adjustment" and a work-in-progress adjustment (the "WIP Adjustment"). See [43], Am. Counterclaim ¶¶ 26, 36, 38. The PSA further provided that $1,622,225 of the preliminary purchase price would be reserved by

Boyd to satisfy any Working Capital Adjustment that was payable to Boyd (the "$1.6 Million Holdback"), and the remainder would be released to D'Orazio. *Id.* at ¶ 28. With respect to the Working Capital Adjustment, § 2.06 of the PSA provided that Boyd would deliver to D'Orazio, within 120 days of the closing, an audited statement setting forth the amount by which it believed that net working capital was either greater or less than zero. See *id.* at ¶ 36. If D'Orazio disagreed with Boyd's figure, he could respond with a written Notice of Disagreement. *Id.* at ¶ 37. Similarly, with respect to the WIP Adjustment, § 2.07(a)(1) of the PSA provided that Boyd would deliver to D'Orazio, within 15 days of the closing, a written calculation of the WIP Adjustment, which was the amount by which the WIP value was greater or less than the WIP minimum value of $1,475,586 set forth in the PSA. *Id.* at ¶¶ 38, 64. Mr. D'Orazio had 15 days thereafter to submit a Notice of Disagreement. *Id.* at ¶ 38.

Section 2.07A of the PSA describes how these two post-closing adjustments would affect the purchase price of the stock. In particular, if the aggregate of the Working Capital Adjustment and WIP Adjustment was negative, then the holdback amount and the preliminary purchase price would be reduced by that number. [43], Am. Counterclaim ¶ 39. If the aggregate exceeded the holdback amounts, the purchase price was further reduced by the product of multiplying the amount by which such number exceeded the holdbacks by 0.5. *Id.*

Although it was due 15 days after closing, Boyd did not deliver its proposed WIP Adjustment until August 12, 2014, or 120 days after closing. [43], Am. Counterclaim ¶ 65. Boyd's proposed WIP value was $632,400, which resulted in a WIP Adjustment of negative $843,188. *Id.* at ¶ 66. D'Orazio alleges that Boyd's calculation was flawed because it was based on an inventory analysis at only one collision repair location. *Id.* at ¶ 66.

**The Sherwin-Williams Release**

Also relevant to the parties' dispute are certain closing conditions set forth in the PSA, including one related to an agreement that D'Orazio had with its paint supplier, Sherwin-Williams. By way of background, in 2010 D'Orazio agreed with Sherwin-Williams that Collision Revision would purchase all of its automotive paints and associated products from Sherwin-Williams (the "Paint Supply Contract"). [43], Am. Counterclaim ¶¶ 22–23. In furtherance of the Paint Supply Contract, Collision Revision executed a Note payable to Sherwin-Williams with a principal amount of $5 million, and D'Orazio executed the accompanying Guaranty. *Id.* at ¶ 22. Given this outstanding agreement, one of Boyd's conditions to closing was its receipt of "evidence of payment of all monies owing pursuant to the Paint Supply Contract" and Sherwin-Williams "confirm[ing] termination of the Paint Supply Contract [and] releas[ing] each Company that is a party thereto from all obligations pursuant to the Paint Supply Contract[.]" [43-8], PSA § 7.02(p).

Fiori D'Orazio, who is Roger D'Orazio's uncle and the CEO of Collision Revision, was tasked with negotiating the termination of the Paint Supply Contract and obtaining a release from Sherwin-Williams.[1] See [6], Am. Compl. ¶¶ 14, 15. Boyd alleges that, prior to the closing, Fiori represented that Sherwin-Williams had agreed to provide a loan payout letter and release, but that it would not be supplied until later on the day of closing or the day thereafter. *Id.* at ¶ 15. Roger D'Orazio alleges that Fiori made a similar representation to him before the closing date— in particular, that Sherwin-Williams had agreed in principle to terminate the Contract if Collision Revision simply paid Sherwin-Williams all then outstanding amounts due under the Contract. See [43], Am. Counterclaim ¶ 47. When it became apparent that a release for the Paint Supply Contract—as well as releases on two other contracts with businesses called Cisco and Cal's

---

[1] To avoid confusion, the Court will refer to Fiori D'Orazio by his first name throughout this opinion.

Revision—would not be executed by the closing date, the parties decided to go forward with the closing but agreed that an additional $4.2 million would be held back from the preliminary purchase price (the "$4.2 Million Holdback"). See *id.* at ¶¶ 29–31. The Closing Statement reflected the additional holdback. Exhibit A to the Statement explains:

> Boyd US shall hold back $4,200,000 pending payoffs for the following: Sherwin Williams, CISCO, Cal's Revision. Once the payoffs are received, Boyd shall make payments to the appropriate parties and release the remaining amount to Seller within fifteen (15) days.

[43-9]. After receiving the Closing Statement, Boyd's counsel followed up with an email to D'Orazio's counsel, stating:

> [W]e need to confirm how we are dealing with monies held back in connection with monies from Cisco, Sherwin Williams and Cal's Collision. The Seller will holdback $4,200,000 US (based on maximum aggregate amount owing plus some extra funds) pending receipt from all 3 parties of acceptable payout statements and full releases or undertaking to provide full releases after which Seller will promptly pay the amounts owing up to the aggregate holdback and forward any balance to Seller. If the amount owing exceeds the holdback Seller will immediately pay the excess. Please confirm.

[6], Am. Compl. ¶ 16 (quoting Exh. B, 04/14/14 email). D'Orazio's counsel confirmed that understanding. *Id.* at ¶ 18. Boyd alleges that he closed on the anticipated closing date in reliance on D'Orazio's counsel's representations as well as on Fiori's representation that the Sherwin-Williams release effectively had been obtained. See *id.* at ¶ 19.

D'Orazio alleges that he learned after the closing that Sherwin-Williams would not in fact agree to terminate the Paint Supply Contract in exchange for payment of outstanding amounts owed. [43], Am. Counterclaim ¶ 52. Although D'Orazio terminated his contracts with Cisco and Cal's Collision, he was unable to terminate the Paint Supply Contract. [6], Am. Compl. ¶ 21. D'Orazio informed Boyd's CEO of the situation with Sherwin-Williams, and Boyd's CEO allegedly stated that Boyd would take care of terminating the Contract and

obtaining the release, as Boyd had contacts at Sherwin-Williams. See *id.* Based on that conversation, D'Orazio alleges that he believed that Boyd had assumed responsibility for securing the release. *Id.*

Thereafter, Boyd paid Sherwin-Williams $9.5 million for a release from any claims related to the Paint Supply Contract (the "Release"). See [43], Am. Counterclaim ¶ 57; [43-1], Release ¶¶ 1–2. The Release applies to Collision Revision and Boyd but states that it does not release D'Orazio from his obligations under the Paint Supply Contract or the personal guaranty that he signed. [43-1], Release ¶ 2. The Release also contemplates Boyd demanding payment from D'Orazio for the $9.5 million that it paid to Sherwin-Williams and Sherwin-Williams seeking recovery from D'Orazio for additional amounts owed under the Paint Supply Contract that were not covered by the $9.5 million. See *id.* at ¶ 5. The Release further states that Collision Revision will reimburse Sherwin-Williams for its related litigation expenses. *Id.* at ¶ 9. Boyd alleges that he worked with Sherwin-Williams for months to negotiate the Release and that D'Orazio refused to cooperate or participate. [6], Am. Compl. ¶¶ 25–26.

**The Parties' Claims and the Engagement of an Accounting Firm**

Boyd's amended complaint asserts eleven claims in connection with the foregoing events, seven of which are relevant to the instant motion to dismiss.[2] In Count I, Boyd alleges that D'Orazio breached § 7.02(p) of the PSA by failing to terminate the Paint Supply Contract or to obtain a release from Sherwin-Williams for Collision Revision. Counts II, III, and IV also are based on D'Orazio's failure to terminate the Paint Supply Contract and obtain a release but are pleaded in the alternative to Count I. Count II asserts that D'Orazio breached a "further assurances" clause in the PSA. Count III is styled as a "common law" breach of contract claim

---

[2] The amended complaint originally asserted thirteen claims, but Counts VII and VIII related to sign permit applications were voluntarily dismissed by Boyd, as noted.

and does not cite any particular provision of the PSA.  Count IV is an unjust enrichment claim.

Count V asserts a breach of the PSA's indemnification clause.  Counts IX and X are fraud and

negligent misrepresentation claims based on false statements that D'Orazio allegedly made about

Sherwin-Williams' willingness to terminate the Paint Supply Contract.

D'Orazio brings four counterclaims, three of which Boyd moves to dismiss.  In Count I,

D'Orazio alleges that the PSA should be reformed so that § 2.06 reflects the parties' alleged

agreement that the $4.2 Million Holdback would be used to cover monies owed to Sherwin-

Williams, Cal's Collision, and Cisco and would be treated the same as the $1.6 Million Holdback

for purposes of calculating the Working Capital Adjustment.  Count III is a breach of contract

claim alleging that Boyd breached the PSA by (1) unreasonably delaying delivery of its proposed

WIP Adjustment, (2) excluding the $4.2 Million Holdback from its post-closing adjustments; and

(3) using monies owed to D'Orazio (presumably the $4.2 Million Holdback) to pay Sherwin-

Williams for a release that did not conform to that contemplated by the PSA.  Count IV alleges,

in the alternative, that the PSA should be rescinded based on mutual mistake.

As noted, D'Orazio also has filed a motion for partial summary judgment in which he

requests that the Court enter an order stating that the $4.2 Million Holdback must be included in

the Working Capital Adjustment and that Boyd no longer is entitled to a WIP Adjustment

because its delay in providing that figure was a material breach of the PSA.  See [27], Mot. at 1.

The parties have agreed to engage the accounting firm McGladrey, LLP to resolve the disputed

post-closing adjustments, but the firm will not begin its work until this Court resolves the legal

issues set forth in D'Orazio's motion for summary judgment.  See [28], Mem. 1–3; [21], Joint

Stipulation ¶¶ 4–6.

## II.    Legal Standard

Both parties have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6).   The purpose of a motion to dismiss is not to decide the merits of the case, but instead to test the sufficiency of the complaint.  See *Gibson v. City of Chi.,* 910 F.2d 1510, 1520 (7th Cir. 1990). As noted, when reviewing a motion to dismiss under Rule 12(b)(6), the Court takes as true all factual allegations in the complaint and draws all reasonable inferences in the non-movant's favor.  *Killingsworth,* 507 F.3d at 618.

To survive a Rule 12(b)(6) motion, the claim first must comply with Rule 8(a) by providing "a short and plain statement of the claim showing that the pleader is entitled to relief" (Fed. R. Civ. P. 8(a)(2)), such that the defendant is given "fair notice of what the * * * claim is and the grounds upon which it rests."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).   The factual allegations also must be sufficient to raise the possibility of relief above the "speculative level," assuming that all of the allegations are true.  *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).  "A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  However, "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what the * * * claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555) (ellipsis in original).  The Court reads the complaint and assesses its plausibility as a whole.  See *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011).

**III.    D'Orazio's Motion to Dismiss the Amended Complaint [15]**

The Court first addresses D'Orazio's motion to dismiss Boyd's (1) breach of contract claims (Counts I, II, III & V); (2) unjust enrichment claim (Count IV); (3) common law fraud claim (Count IX); and (4) negligent misrepresentation claim (Count X).

**A.    Breach of Contract**

D'Orazio moves to dismiss Boyd's breach of contract claims, all of which are premised on D'Orazio's failure to terminate the Paint Supply Contract and obtain a release for Collision Revision from Sherwin-Williams.  D'Orazio primarily argues that the claims are deficient because they are not premised on a breach of a contractual *obligation*; rather terminating the Paint Supply Contract and securing a release was only a condition precedent to Boyd's obligation to close the deal.

Under Illinois law (which the parties do not dispute governs), "[a] condition precedent is some act that must be performed or event that must occur before a contract becomes effective or before one party to an existing contract is obligated to perform."  *Hardin, Rodriguez & Boivin Anesthesiologists, Ltd. v. Paradigm Ins. Co.*, 962 F.2d 628, 633 (7th Cir. 1992).  Failing to perform a condition precedent may be construed as a breach of contract in appropriate circumstances.  See *id.* (citing Restatement (Second) of Contracts § 225(3)).  According to the Restatement, the "[n]on-occurrence of a condition is *not* a breach by a party *unless he is under a duty that the condition occur*."  Restatement (Second) of Contracts § 225(3) (emphasis added); see also *TAS Distrib. Co., Inc. v. Cummins Engine Co., Inc.*, 491 F.3d 625, 631 (7th Cir. 2007) ("Only a duty imposed by the terms of a contract can give rise to a breach.") (internal quotation marks omitted).  To determine whether the PSA imposed a duty on D'Orazio to terminate the Paint Supply Contract and secure a release from Sherwin-Williams, the Court looks to the plain

language of the PSA with the "primary objective [of] determin[ing] and giv[ing] effect to the intentions of the parties at the time they entered into the contract." *Tranzact Technologies, Ltd. v. Evergreen Partners, Ltd.,* 366 F.3d 542, 546 (7th Cir. 2004) (quoting *Ancraft Prods. Co. v. Universal Oil Prods. Co.*, 427 NE.2d 585, 588 (Ill. 1981)). Ambiguity does not arise simply because the parties disagree on the meaning of a particular term in the PSA. See *id.* at 548.

Count I is premised on a breach of § 7.02(p) of the PSA, which conditions Boyd's obligation to close on actual termination of the Paint Supply Contract. Section § 7.02(p) states:

> The obligations of the Purchaser to effect the Transaction is subject to the satisfaction at or prior to the Closing Time of the following additional conditions * * * Purchaser receives evidence of payment of all monies owing pursuant to the Paint Supply Contract and The Sherwin-Williams Company confirms termination of the Paint Supply Contract releases each Company that is a party thereto from all obligations pursuant to the Paint Supply Contract[.]

[43-8], PSA § 7.02(p). According to Boyd, this provision obligated D'Orazio to terminate the Contract and obtain a release. See [6], Am. Compl. ¶¶ 11–12. The plain language of § 7.02(p) does not support Boyd's interpretation. As D'Orazio points out, subsection (p) does not even mention D'Orazio or the Seller, let alone state that he is required to take any action with respect to Sherwin-Williams or the Paint Supply Contract. Further, the cases that Boyd cites in support of its claim simply stand for the proposition that failing to perform a condition may support a breach of contract claim if the condition imposes a duty; none support Boyd's reading of § 7.02(p), which would impose a duty on D'Orazio that is not present in the PSA. See, *e.g.*, *LaSalle Bank Nat'l Assoc. v. Paramont Properties*, 588 F. Supp. 2d 840, 855 (N.D. Ill. 2008) (finding valid breach of contract claim based on "mandatory precondition" provision and noting use of "shall" language in provision). Accordingly, Count I is dismissed.

Counts II and V allege that D'Orazio breached other provisions of the PSA by failing to terminate the Paint Supply Contract. Count II relies on a "Further Assurances" clause that states:

The parties agree (a) to furnish upon request to each other such information, (b) to execute and deliver to each other such other documents, and (c) to do such acts and things, all as the other parties may reasonably request for the purpose of carrying out the intent of this Agreement and the documents referred to in this Agreement.

[43-8], PSA § 10.02.  D'Orazio contends that this clause does not support a unique breach of contract claim, because it does not impose a separate contractual obligation on him, apart from his duty to cooperate to carry out his obligations under the PSA.

In support, D'Orazio cites several cases from other jurisdictions in which courts refused to impose new or different obligations on parties pursuant to further assurance clauses.  See *97th St. Holdings LLC v. East Side Tenants Corp.*, 82 A.D.3d 473, 474 (N.Y. App. Div. 2011) (additional obligation could not be imputed from "generalized language found in the contract's further assurances clause" as that "would amount to a reformation of the contract without basis"); *Madera Prod. Co. v. Atlantic Richfield Co.*, 1998 WL 292872, *6–7 (N.D. Tex. June 1, 1998) (clause that obligated parties to take "such further actions * * * that are necessary or useful in carrying out the purpose of the Agreement" did not obligate defendant to agree to make changes to contract).[3]  Boyd responds by clarifying that § 10.02 of the PSA "seeks to enforce D'Orazio's obligations *under the PSA* and *not outside of its terms*."  [32], Resp. Br. 4–5 (emphasis added).  The Court already has determined that § 7.02(p) of the PSA does not impose on D'Orazio an obligation or duty to terminate the Paint Supply Contract, however; and Boyd has not pointed to a different provision in the PSA under which D'Orazio was obligated to do so. Accordingly, Count II is dismissed.

Count V asserts a breach of an indemnification clause in the PSA, pursuant to which D'Orazio agreed to indemnify Boyd for losses arising from breaches of representations,

---

[3] The parties do not cite any Illinois or Seventh Circuit law interpreting a further assurances clause like the one at issue in the PSA, nor has the Court's own research located any such cases.

warranties, covenants or other agreements contained in the PSA. See [43-8], PSA § 9.02(a).

Count V does not specify the underlying breach on which the indemnification claim is based; the

allegations merely state that D'Orazio "breached the PSA, by among other things, failing to

properly indemnify Boyd for its breaches as required by [the indemnification clause]." [6], Am.

Compl. ¶ 81. To the extent that Count V is premised on a breach of § 7.02(p) or the Further

Assurances provision in § 10.02, it likewise is deficient for the reasons explained above and is

dismissed.

Finally, Count III—styled as a "common law" breach of contract claim[4] "pled in the

alternative to Count I"—is premised on emails that the parties exchanging regarding the $4.2

Million Holdback. In particular, Boyd alleges:

> * * * Seller, through his counsel, confirmed, in an April 14, 2014 email, that Boyd
> could hold back $4.2M of the purchase price until the termination and release of
> the S-W Paint Supply Contract (and two other agreements) were provided. In
> addition, Seller, through his counsel, agreed, in that same email, that Seller would
> pay any excess amounts due and owing in connection with the termination and
> release of those three agreements. * * * Seller breached his obligations pursuant
> to that agreement by failing to terminate the S-W Paint Supply Contract and
> secure a release[.] Seller further breached his obligations pursuant to that
> agreement by failing to make Boyd whole * * * for the costs Boyd incurred in
> terminating the Paint Supply Contract and securing [Collision Revision's] release
> therefrom."

[6], Am. Compl. ¶¶ 66–70. These allegations suggest that D'Orazio breached an agreement

reached on April 14, 2014 by failing to terminate the Paint Supply Contract after the closing and

reimburse Boyd for costs that it incurred to terminate the Contract. Boyd maintains, however,

that it brings Count III "under the PSA" and that the alleged emails "merely confirm" D'Orazio's

obligation under the PSA to terminate the Paint Supply Contract. [32], Resp. Br. 5, 9. The Court

---

[4] Presumably, Boyd labeled Count III as a "common law" claim because it is not premised on an express
provision in the PSA. Although not material to the Court's disposition of this claim, the Court notes that
all of Boyd's breach of contract claims—whether premised on the PSA or another alleged agreement—
are common law claims.

accordingly understands Count III to be premised on the PSA—as opposed to on some sort of secondary agreement outside of the PSA—and analyzes it as such.[5]  For the reasons that follow, this claim must be dismissed.

As D'Orazio argues in his motion, the PSA contains an integration clause that states:

> Entire Agreement.  This Agreement (including the documents and instruments referred to in this Agreement and any party signing a joinder agreement) constitutes the entire agreement of the parties and supersedes all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof and is not intended to confer any other Person any rights or remedies hereunder.

[43-8], PSA § 10.05.  In light of this clause, D'Orazio argues that Boyd cannot rely on the April 2014 emails that discussed the $4.2 Million Holdback.  In response, Boyd asserts that the emails may be considered because they do not contradict the terms of the PSA.  It further argues that to the extent that the parties disagree on whether § 7.02(p) obligated D'Orazio to terminate the Paint Supply Contract, the emails may be considered to clarify the parties' intent.

The Court disagrees with Boyd on this point.  "[W]here parties formally include an integration clause in their contract, they are explicitly manifesting their intention to protect themselves against misinterpretations which might arise from extrinsic evidence."  *TAS Distrib. Co.*, 491 F.3d at 636 (quoting *Air Safety, Inc. v. Teachers Realty Corp.*, 706 N.E.2d 882, 885 (Ill. 1999)).  Accordingly, if a contract is facially unambiguous and contains an integration clause, as is the case here, courts are barred from considering extrinsic evidence and the "four corners rule" applies.  *Id.*  Under that rule, the Court may not consider evidence related to understandings "not reflected in the terms of the [PSA], reached either before or at the time of the contract's execution, where those terms would vary or modify the terms of the [PSA] itself."  See *id.* at 637.

---

[5] If the Court's understanding is inaccurate, Boyd may clarify its allegations and the basis for its claim in an amended pleading.

Based on the foregoing discussion, the Court must dismiss Count III. With respect to D'Orazio's alleged breach of a purported obligation to terminate the Paint Supply Contract, [6], Am. Compl. ¶ 69, the Court already has explained that the PSA did not obligate him to do so. To the extent that Boyd attempts to rely on emails to infer such an obligation in the PSA, the Court cannot consider the emails, as inferring such an obligation from them would change §7.02, which is an unambiguous provision within an integrated agreement. With respect to Mr. D'Orazio's alleged breach of a purported obligation to pay Boyd for its costs in terminating the Paint Supply Contract," *id.* at ¶ 70, Boyd has not pointed to an existing contractual provision in the PSA that imposes such an obligation him. As such, any alleged agreement that was reached by the parties via email would change the PSA and likewise may not be considered under the four corners rule. Count III accordingly is dismissed.

## B.        Unjust enrichment

In Count IV, Boyd asserts an unjust enrichment claim. Specially, Boyd alleges that "[a]s part of [the parties'] agreement [to sell Collision Revision], Boyd required that [Mr. D'Orazio] terminate the Paint Supply Contract and secure a release for [Collision Revision] from it." [6], Am. Compl. ¶ 74. It further alleges that Mr. D'Orazio "failed and refused to terminate the Paint Supply Contract * * * at great expense to Boyd." *Id.* at ¶ 75. As a consequence, Boyd "has suffered a detriment in excess of $8 million." *Id.* at ¶ 76. Finally, Mr. D'Orazio's "refusal to make Boyd whole for its losses in connection with the sale of [Collision Revision] violates the fundamental principles of justice, equity, and good conscience[.]" *Id.* at ¶ 77. The Court concludes that these allegations fail to state an unjust enrichment claim.

Unjust enrichment provides a theory of recovery or restitution "that arises when the defendant is retaining a benefit to the plaintiff's detriment, and this retention is unjust." *Cleary*

*v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011). To state a claim, the plaintiff must allege that "the defendant has unjustly retained a benefit to the plaintiff's detriment, and that the defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." *Id.* at 516 (quoting *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989)). Importantly, "[b]ecause unjust enrichment is based on an implied contract, 'where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.'" *People ex rel. Hartigan v. E & E Hauling, Inc.*, 607 N.E.2d 165, 177 (Ill. 1992) (quoting *La Throp v. Bell Fed. Savings & Loan Ass'n*, 370 N.E.2d 188 (Ill. 1977)). Although a party cannot *recover* under both breach of contract and unjust enrichment theories, the claims may be pleaded in the alternative. See *Prudential Ins. Co. of America v. Clark Consulting, Inc.* 548 F. Supp. 2d 619, 623–24 (N.D. Ill. 2008). D'Orazio argues that Count IV should be dismissed because Boyd fails to properly plead its unjust enrichment claim in the alternative to its breach of contract claims. The Court agrees and also concludes that the claim lacks certain allegations that are necessary to state a claim.

As to the alternative pleading point, the Court concludes that Boyd has not properly alleged its claim in the alternative. Although the caption of Count IV states, "pled in the alternative to Count I," the first paragraph of the count states that it "incorporates by reference paragraphs 1 through 46 of [the] Amended Complaint." [6], Am. Compl. ¶ 72. These paragraphs allege that an express contract, the PSA, governed the parties relationship; paragraph one, for example, states that the lawsuit arises from D'Orazio's "failure to honor the explicit terms of [the] [PSA]," *id.* at ¶ 1. Boyd also references the PSA in the unjust enrichment count by alleging: "Seller sold [Collision Revision] * * * to Boyd for a substantial amount of money. *As part of that agreement*, Boyd required that Seller terminate the Paint Supply Contract[.]" *Id.* at

15

¶¶ 73–74 (emphasis added).  Because the unjust enrichment claim references the PSA and incorporates paragraphs that allege that the PSA was breached, it must be dismissed.  See, *e.g.*, *Cole-Haddon, Ltd. v. Drew Philips Corp.*, 454 F. Supp. 2d 772, 777 (N.D. Ill. 2006) (dismissing unjust enrichment claim because plaintiff reasserted all allegations previously alleged, including one that alleged the existence of a contractual agreement between the parties); *Team Impressions, Inc. v. Chromas Technologies Canada, Inc.*, 2003 WL 355647, at *4 (N.D. Ill. Feb. 18, 2003) (dismissing unjust enrichment claim because it included allegations of a specific contract governing the parties' relationship).

More significantly, Boyd has failed to sufficiently allege that D'Orazio retained a benefit, or any specifics of such a benefit, as is required to state an unjust enrichment claim.  See *Cleary*, 656 F.3d at 517.  Boyd only vaguely references "Seller's failure to pay amounts due Boyd for the benefits received by Seller," [6], Am. Compl. ¶ 78, but it fails to allege any facts in support that conclusory allegation.  Indeed, instead of setting forth a viable unjust enrichment theory, the amended complaint, as alleged, implies that D'Orazio simply breached his obligation to secure a release from Sherwin-Williams.  This, of course, is the basis for Boyd's breach of contract claims, which the Court already has dismissed.  For all of these reasons, Count IV is dismissed.

### C.     Fraud

In Count IX, Boyd brings a fraud claim against D'Orazio based on alleged misrepresentations that were made by his agent, Fiori D'Orazio, about the status of the Sherwin-Williams release.  To plead a common law fraud action, a plaintiff must allege "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement."

*Tricontinental Indus., Ltd. v. PricewaterhouseCoopers, LLP*, 475 F.3d 824, 841 (7th Cir. 2007) (quoting *Connick v. Suzuki Motor Co., Ltd.*, 675 N.E.2d 584, 591 (Ill. 1996)). Fraud allegations are subject to the heightened pleading requirements of Rule 9(b), which require the plaintiff to plead the "who, what, when, where, and how" of the alleged fraud." *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). As D'Orazio points out, a fraud claim may not be premised on the mere breach of a contract; rather there must be a "fraudulent act distinct from the alleged breach of contract." See *Greenberger v. GEICO General Ins. Co.*, 631 F.3d 392, 401 (7th Cir. 2011). Based on the foregoing discussion, the Court concludes that Boyd's allegations are sufficient to state a fraud claim.

In particular, Boyd alleges that prior to the closing, Fiori D'Orazio (acting on behalf of Roger D'Orazio) falsely stated to Boyd that "he was in the process of terminating the Paint Supply Contract and securing a release," and that Sherwin-Williams "had agreed to provide a loan payout letter and a release of the [Contract]." [6], Am. Compl. ¶¶ 15, 107. Boyd alleges that Fiori made these statements to induce Boyd to close the deal, knowing that Sherwin-Williams had never agreed to terminate the Contract. See *id.* at ¶¶ 108–109. Boyd further alleges that it relied on these representations in deciding to go ahead with the deal despite not having the release in hand on April 14, 2014. See *id.* at ¶ 112. Although Boyd knew that the release would not be brought to the closing, it believed that the release effectively had been negotiated and obtained and would be delivered shortly thereafter.

Moreover, none of the purported deficiencies that D'Orazio identifies in his motion require dismissal of this claim. D'Orazio's first contention that the claim is merely a recitation of Boyd's breach of contract claims—thus warranting dismissal under *Greenberger*—is incorrect. To the contrary, the fraud claim is premised on alleged false statements that were

made prior to the closing about the status of the Sherwin-Williams release and D'Orazio's ability to eventually obtain it. These alleged representations qualify as fraudulent misrepresentations separate and apart from D'Orazio's breach on an alleged obligation to terminate the Paint Supply Contract, unlike those that were found to be insufficient in *Greenberger*. See 631 F.3d at 401 (dismissing fraud claim because it was "just a reformulation of the contract clam [as] [the plaintiff] failed to identify any fraudulent act distinct from the alleged breach of contract[.]").

D'Orazio next contends that Boyd has failed to allege a false statement of present or pre-existing fact. Under Illinois law, unless a plaintiff had pleaded a scheme to defraud, fraud claims are limited to misrepresentations concerning present or past facts, as opposed to false statements of intent regarding future conduct. *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 570 (7th Cir. 2012). Boyd's fraud allegations comport with this rule, as it alleges that Fiori D'Orazio was dishonest about the status of the Paint Supply Contract and Sherwin-Williams' position on terminating it. Although the actual termination of the Contract, and the execution of the accompanying release, were to occur in the future, Fiori's alleged misrepresentations concerned present or past facts—namely that "he was *in the process of* terminating the Paint Supply Contract and securing a release," and that Sherwin-Williams "*had agreed* to provide a loan payout letter and a release of the [Contract]." [6], Am. Compl. ¶¶ 15, 107 (emphasis added).

Finally, D'Orazio contends that Boyd fails to sufficiently allege that it reasonably relied on Fiori D'Orazio's misrepresentations. In his view, the reliance allegations are "conclusory," and Boyd could not have *reasonably* relied on Fiori's statements, given that the parties conditioned Boyd's obligation to close on actual confirmation from Sherwin-Williams that the Paint Supply Contract was terminated. As to the first point, although the reliance allegations are not particularly comprehensive or protracted, they are sufficient for purposes of surviving a

motion to dismiss, where the Court assesses allegations by reading the complaint as a whole, see *Atkins v. City of Chi.*, 631 F.3d 823, 832 (7th Cir. 2011). Here, Boyd alleges that it decided to close as planned based in part on Fiori's representations about his ability to obtain the release from Sherwin-Williams shortly after closing. In context, these relatively simple and straightforward reliance allegations are plausible and sufficient.

With respect to second point, the Court declines to dismiss the fraud claim based on the purported unreasonableness of Boyd's reliance. Whether reliance is reasonable is generally ill-suited for determination on a motion to dismiss. See *Rowe v. Maremont Corp.*, 850 F.2d 1226, 1234 (7th Cir. 1988) ("In a common law fraud case, we * * * held [ ] that the trier-of-fact can best decide whether a plaintiff reasonably relied on a defendant's misstatements."); *Sims v. Tezak*, 296 Ill. App. 3d 503, 511 (Ill. App. Ct. 1st Dist. 1998) ("[T]he justifiable reliance element of fraud is a question of fact * * * the facts may very well show that plaintiffs were unjustified in relying upon the representations made by defendants * * * such questions are to be determined by the finder of fact and not by the trial court as a matter of law."). In addition, D'Orazio has not cited any authority that supports his position that Boyd could *not* justifiably rely on statements by persons that operated the business that it was preparing to purchase, merely because its obligation to close was conditioned on certain events.

For all of the reasons stated above, the Court finds that Boyd has stated a valid common law fraud claim and denies D'Orazio's motion to dismiss Count IX.

### D. Negligent Misrepresentation

Count X is premised on the same allegations as Count IX, but under a negligent misrepresentation theory. D'Orazio moves to dismiss this claim under *Moorman Manufacturing Company v. National Tank Company*, 91 Ill. 2d 69 (Ill. 1982). Under the *Moorman* doctrine, a

plaintiff may not recover for "solely economic loss unless the defendant either 'intentionally makes false representations' or 'is in the business of supplying information for the guidance of others in their business transaction [and] makes negligent misrepresentations.'" *Rankow v. First Chicago Corp.*, 870 F.2d 356, 362 (7th Cir. 1989) (quoting *Moorman Mfg. Co.*, 91 Ill. 2d at 88–89)). Boyd does not dispute the applicability of the *Moorman* rule to his negligent misrepresentation claim, but contends that he has stated a valid claim because D'Orazio was in the business of supplying information, thus triggering an exception to the rule. See [32], Resp. Br. 14–15. The Court disagrees.

For one, Boyd has not pleaded, even in conclusory fashion, that D'Orazio was in the business of supplying information, thus warranting dismissal of its claim. See, *e.g.*, *Dixie-Portland Flour Mills, Inc. v. Nation Enterprises, Inc.*, 613 F. Supp. 985, 990 (N.D. Ill. 1985) (dismissing negligent misrepresentation claim because counter-plaintiff failed to allege that counter-defendant was in such a business). Even overlooking the omission, Boyd has not pleaded facts that plausibly suggest that D'Orazio's collision repair business qualifies as a business that supplies information for the guidance of others. To determine whether a defendant qualifies under this exception, courts ask whether a defendant's product or part of its product is "information." See *Rankow*, 870 F.2d at 364. Courts accordingly have held that stockbrokers, real estate brokers, and termite inspectors qualify because they supply actual "information," whereas developers, builders, and manufacturers do not. See *id.* at 363–64. Any information supplied by the latter group is merely incidental to their products. See *id.*

Here of course, D'Orazio is alleged to be in the collision repair business. Boyd contends that D'Orazio nonetheless qualifies as a supplier of information because he had to provide Boyd with certain information about the status of the Paint Supply Contract under the PSA. See [32],

Resp. Br. 15. But any such information was meant merely to facilitate the transaction between the parties; it was not part of D'Orazio's business or his product. See *Rankow*, 870 F.2d at 361. Count X therefore is dismissed.

## IV. Boyd's Motion to Dismiss the Amended Counterclaim [53]

Having decided D'Orazio's motion to dismiss, the Court turns to Boyd's motion to dismiss D'Orazio's counterclaims, which allege that (1) the PSA should be reformed, (2) Boyd breached the PSA, and (3) alternatively, the Court should rescind the PSA. The Court addresses these claims in turn below.

### A. Reformation of the PSA

In his first counterclaim, D'Orazio requests that the Court enter an order reforming § 2.06(a) of the PSA, which addresses the $1.6 Million Holdback. As written, the PSA states:

> Holdback. At closing, $1,622,225 of the Preliminary Purchase Price (the "Holdback Amount") shall be reserved by the Purchaser to satisfy any Post-Closing Working Capital Adjustment payable to the Purchaser as provided in Section 2.06(b). The remainder of the Holdback Amount, if any, shall be released to the Seller in accordance with Section 2.04(c) on the Holdback Release Date.

[43-8], PSA § 2.06(a). D'Orazio contends that this section should be reformed so that it "treats the $4.2 Million Holdback the same as the $1.6 Million Holdback for purposes of the post-closing adjustment for Net Working Capital." [43], Am. Counterclaim ¶ 83.

"Reformation is available when the parties, having reached an agreement and having then attempted to reduce it to writing, fail to express it correctly in the writing." *Indiana Ins. Co. v. Pana Community Unit School Dist. No. 8*, 314 F.3d 895, 903–04 (7th Cir. 2002) (quoting Restatement (Second) of Contracts, § 155 cmt. a). Reformation is used to "insert[ ] some omitted provision or delet[e] some existing provision so that the document conforms to the original agreement of the parties." *Wheeler-Dealer, Ltd. v. Christ*, 379 Ill. App. 3d 864, 869 (Ill.

App. Ct. 1st Dist. 2008). The elements of reformation include: "(1) * * * a meeting of the minds resulting in an actual agreement between the parties; (2) the parties agreed to reduce their agreement to writing; and (3) at the time the agreement was reduced to writing and executed, some agreed upon provision was omitted or one not agreed upon was inserted [ ] through mutual mistake[.]" *Indiana Ins. Co.*, 314 F.3d at 904 (quoting *Alliance Syndicate v. Parsec, Inc.*, 741 N.E.2d 1039, 1048 (Ill. App. Ct. 2000)). Boyd argues that Count I fails because D'Orazio does not sufficiently allege that the parties reached an agreement regarding the treatment of the $4.2 Million Holdback, particularly given that D'Orazio alleges that the parties disagreed (post-closing) on how the Working Capital Adjustment would account for the holdback.

The Court disagrees. D'Orazio alleges that as of the closing date, Sherwin-Williams was owed $4 million, and Cisco and Cal's Revision were owed $200,000. [43], Am. Counterclaim ¶ 32. The parties further "understood that all or a portion of the $4.2 Million Holdback would be either used to pay off the liabilities reflected * * * [in] the Closing Statement or be transmitted to D'Orazio to the extent he paid off those liabilities himself." *Id.* at ¶ 33. With this background in mind, D'Orazio alleges that the parties "understood that to the extent the liabilities * * * reflected [in] the Closing Statement remained on [Collision Revision's] books as of the closing date, for purposes of the post-closing adjustment to the Purchase Price the parties would treat the $4.2 Million Holdback in the same manner as the $1.6 Million Holdback under Section 2.06 of the PSA." *Id.* at ¶ 34. These allegations are sufficient to plausibly allege that the parties had reached an agreement as to the treatment of the $4.2 Million Holdback for purposes of calculating the adjusted purchase price.

With that said, the claim still must be dismissed, as there are no allegations suggesting that the parties' failure to memorialize their agreement in the PSA was due to a factual mistake,

which is "a prerequisite for relief in a reformation action," *Wheeler-Dealer, Ltd.*, 379 Ill. App. 3d at 871. To the contrary, D'Orazio's allegations suggest that the parties opted to close on time, *knowing* that the PSA did not reflect their understanding with respect to the $4.2 Million Holdback. This does not qualify as a mutual mistake under Illinois law.

In particular, "[a] mutual mistake is one where both parties understand that the real agreement is what one party alleges it to be, then, *unintentionally*, a drafted and signed contract does not express the true agreement." *Cameron v. Bogusz*, 305 Ill. App. 3d 267, 272 (Ill. App. Ct. 1st Dist. 1999) (emphasis added). See also *Spies v. De Mayo*, 396 Ill. 255, 272 (Ill. 1947) (a mutual mistake that supports reformation occurs when "the parties intended to say a certain thing but mistakenly expressed another."). Reformation is appropriate in such circumstances because "an actual understanding has been reached by the parties, but *through some error*, their written contract does not express their actual understanding." *Wheeler-Dealer, Ltd.*, 379 Ill. App. 3d at 871 (emphasis added); see also *Young v. Verizon's Bell Atlantic Cash Balance Plan*, 667 F. Supp. 2d 850, 894 (N.D. Ill. 2009) (reformation is appropriate where "a written agreement does not reflect the clear intent of the parties *due to a drafting error*.") (emphasis added).

Here, D'Orazio alleges that the parties "failed to amend the PSA to fully and accurately reflect their agreement regarding the $4.2 Million Holdback" due to "the last minute nature of the agreement regarding the [ ] Holdback," and their "haste of trying to close the transaction." [43], Am. Counterclaim ¶¶ 35, 82. Not having enough time to amend the PSA does not qualify as a drafting error, or any other sort of error, that would make reformation appropriate; and there are no other allegations—apart from the conclusory allegation that a "mutual mistake" occurred, *id.* at ¶ 83—that might plausibly indicate that the parties unintentionally entered the PSA believing that it addressed their agreement on the $4.2 Million Holdback. The Court therefore

23

dismisses the reformation claim.

## B.      Breach of Contract

In Count III, D'Orazio alleges that Boyd breached the PSA by (1) unreasonably delaying delivery of its WIP Adjustment; (2) improperly excluding the $4.2 Million Holdback from its proposed post-closing adjustments; and (3) using monies owed to Mr. D'Orazio under the PSA to obtain a release from Sherwin-Williams that did not comply with that contemplated by § 7.02(p) of the PSA.  See [43], Am. Counterclaim ¶ 88.  These claims are addressed below.

### 1.      Delayed delivery of the proposed WIP Adjustment

D'Orazio first alleges that Boyd breached the PSA by failing to deliver its proposed WIP Adjustment on time in violation of § 2.07 of the PSA.  [43], Am. Counterclaim ¶¶ 65, 88.   In particular, subsection (a)(1) obligated Boyd to deliver its proposed WIP figure within 15 days of the closing date; Boyd allegedly failed to deliver it until 120 days after closing.  See *id.*  Boyd contends that this claim should be dismissed because D'Orazio fails to sufficiently allege that he was damaged by Boyd's delay.  Under Illinois law, a valid breach of contract claim requires that the plaintiff sufficiently allege damages that resulted from the other party's breach. *TAS Distrib. Co.*, 491 F.3d at 631.

The Court respectfully disagrees with Boyd on this point.  D'Orazio alleges that Boyd's delay "severely impacted [his] accountants' ability to meaningfully respond to [Boyd's] proposed WIP Adjustment," as allowed under the PSA.  [43], Am. Counterclaim ¶ 67.   In support, he further alleges that "inventory in a collision repair facility is fluid and changes daily," meaning that 120 days after closing, "it would be nearly impossible * * * to accurately determine the percentage of work that was completed with respect to each of the 1,015 repair orders that were open at the time of closing."  *Id.*  D'Orazio also sufficiently alleges a nexus between

Boyd's delay (the breach) and his injury (a potentially lower price). He alleges that Boyd's WIP Adjustment "materially understated the Companies' actual WIP" because Boyd based its analysis on inventory at only one of 25 locations. *Id.* at ¶ 66. Boyd valued WIP at only $632,400, or less than half of the "Minimum WIP Value" set forth in the PSA. *Id.* at ¶¶ 64, 66. This resulted in a WIP Adjustment of negative $843,188, meaning that Boyd's position is that it is entitled to reduce the preliminary purchase price by at least this amount based on its claimed WIP shortfall. See *id.* at ¶¶ 66, 69; see also [64], Opp'n Br. 5. These allegations are sufficient to put Boyd on notice of damages that allegedly were caused by its delay; they also are specific enough to state a plausible claim.

### 2. Excluding the $4.2 Million Holdback from the post-closing adjustments

D'Orazio alleges that Boyd further breached the PSA by "incorrectly calculating its Post-Closing Working Capital and WIP Adjustments by improperly excluding the $4.2 Million Additional Holdback." [43], Am. Counterclaim ¶ 88. In its motion to dismiss, Boyd essentially argues that this claim must be dismissed because the PSA, as executed, did not address the $4.2 Million Holdback or obligate Boyd to treat the holdback monies in a particular way with respect to the post-closing adjustments. In fact, as Boyd points out, the PSA contemplated disputes over the adjustment figures and included procedures to resolve such disputes.

In his response brief, D'Orazio essentially concedes that the PSA, as executed, did not require Boyd to include the $4.2 Million Holdback in its proposed post-closing adjustments. He explains that this claim rather is based on a breach of a reformed PSA, as detailed in his reformation claim (Count I). See [64], Opp'n Br. 6 ("Mr. D'Orazio alleged that the PSA should be reformed as the parties agreed to treat the $4.2 Million Holdback the same as the $1.6 Million Holdback[.] * * * As reformed, the PSA requires the $4.2 Million Holdback be included in the

calculation of the Post-Closing Adjustments under Section 2.06[.]"). The Court already has concluded, however, that D'Orazio's reformation claim must be dismissed. Because his breach of contract claim is premised on a valid reformation claim, the Court likewise must dismiss Count III to the extent that it alleges that Boyd breached the PSA by excluding the $4.2 Million Holdback from its post-closing adjustment figures.

### 3. The Sherwin-Williams release obtained by Boyd

Finally, D'Orazio alleges that Boyd breached the PSA by obtaining a release from Sherwin-Williams that did not release him from liability under the Paint Supply Contract. He alleges that Boyd's release "was materially different from what the parties contemplated and agreed would be obtained pursuant to Section 7.02(p) of the PSA: namely, the complete termination of the Sherwin-Williams Agreement and a full release by Sherwin-Williams of both [Collision Revision] and D'Orazio." [43], Am. Counterclaim ¶ 58. As the Court already has explained, however, § 7.02(p) is merely a condition to Boyd's obligation to close the transaction. Although the condition may have contemplated a release that included D'Orazio, see [43-8], PSA § 7.02(p), the condition did not impose a duty on either D'Orazio or Boyd to actually obtain the release. Accordingly, just as Boyd cannot claim that D'Orazio breached § 7.02(p) by failing to obtain a release, D'Orazio cannot claim that Boyd breached it by negotiating a release that differed from that described in § 7.02(p).

### C. Rescission of the PSA

In his final counterclaim, D'Orazio alleges that the PSA should be rescinded based on the parties' mutual mistake concerning Sherwin-Williams' willingness to terminate the Paint Supply Contract for approximately $4 million. Under Illinois law, a contract may be rescinded due to mutual mistake if: "(1) the mistake is of a material nature; (2) the mistake is of such consequence

that enforcement is unconscionable; (3) the mistake occurred notwithstanding the exercise of due care by the party seeking rescission; and (4) rescission can place the other party in status quo." *Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, 936 F. Supp. 2d 933, 944 (N.D. Ill. 2013) (quoting *Siegel v. Levy Org. Develop. Co., Inc.*, 607 N.E.2d 194, 199 (Ill. 1992)).  Boyd challenges the sufficiency of the allegations on each of these elements.  For the reasons that follow, the Court concludes that the claim must be dismissed because D'Orazio has not alleged a mutual mistake under Illinois law.

The type of mistake that allows for rescission must "relat[e] to an essential element of the contract" and "prevent a meeting of the minds of the parties" such that no agreement is made. *Wheeler-Dealer, Ltd.*, 379 Ill. App. 3d at 871 (quoting *Harley v. Magnolia Petroleum Co.*, 378 Ill. 19, 28 (Ill. 1941)).  Importantly, the type of mutual mistake that supports rescission is one that is of such grave consequence that it causes the contract not to express the true agreement that the parties had.  See *Cameron*, 305 Ill. App. 3d at 272; *Diedrich v. Northern Illinois Pub. Co.*, 39 Ill. App. 3d 851, 857 (Ill. App. Ct. 2d Dist. 1976) (explaining that rescission is available "[i]f by reason of a mistake of fact * * * the contract is different with respect to the subject matter or terms from what was intended").  Such mistakes are "fundamental in character" and usually include those concerning "the existence and identity of the subject matter [and] errors as to price [and] quantity." *MAN Roland Inc. v. Quantum Color Corp.*, 57 F. Supp. 2d 576, 579 (N.D. Ill. 1999) (quoting *Harley*, 37 N.E.2d at 765).  See, *e.g.*, *Al Maha Trading*, 936 F. Supp. 2d at 944–45 (purchaser of firetrucks stated claim for rescission because the trucks that purchaser received had diesel engines that required a type of fuel not available in the country where the trucks were to be used); *Piper v. DPFA*, 2010 WL 2836814, at *6–7 (N.D. Ill. July 20, 2010) (purchaser of sculpture stated valid rescission claim where sculpture turned out not to be unique

and was instead part of an edition). Mistakes about the cost of performance do not provide grounds for rescission, "because each party assumes the risk that their assumption as to the cost of performance was wrong," or that the "contract is less profitable" than anticipated. *Bond Drug Co. of Illinois v. Amoco Oil Co.*, 274 Ill. App. 3d 630, 635 (Ill. App. Ct. 1st Dist. 1995). See also *MAN Roland Inc.*, 57 F. Supp. 2d at 580 (explaining that a mistake that relates to the value of a transaction is not grounds for rescission).

Here, the rescission allegations do not suggest that the PSA failed to capture the parties' true agreement. To the contrary, the PSA contemplated that the Paint Supply Contract perhaps could not be terminated by the closing, as the parties' obligations to close expressly were conditioned on its termination. See [43-8], PSA § 7.02(p) (conditioning buyer's obligation to close on Sherwin-Williams confirming termination of Contract); *id.* at § 7.03(e) (conditioning seller's obligation to close on having "reached an agreement with Sherwin-Williams for the resolution of the * * * Paint Supply Contract upon terms and condition[s] acceptable to Seller."). There are no allegations suggesting that the parties' mistaken belief about Sherwin-Williams' willingness to terminate the Paint Supply Contract for a particular price caused the PSA to express something other than what the parties intended. Relatedly, the parties obviously were aware of the outstanding Paint Supply Contract when they drafted the PSA and decided to close. As such, any "mistake" that the parties made in deciding to close as planned relates to the cost and value of the transaction, not to a material fact or assumption on which the PSA was based. See *Bond Drug Co.*, 274 Ill. App. 3d at 635–36 (rejecting rescission claim based on parties' mistake about consequences of a petroleum leak from underground storage tank, because defendant knew of the leak and "how to protect itself contractually from such risks prior to negotiating and entering into the [contract]").

In addition, the parties' mistake about Sherwin-Williams' willingness to terminate the Paint Supply Contract for a certain price is collateral to the main purpose of the PSA—namely, the sale of D'Orazio's collision repair businesses to Boyd. Although the Paint Supply Contract certainly was a substantial liability for both parties, the allegations do not indicate that their mutual mistake about what it would cost to terminate the Contract went to the purpose or subject matter of the PSA, as is required to state a rescission claim. See, *e.g.*, *Van Schouwen v. Connaught Corp*, 782 F. Supp. 1240, 1244 (N.D. Ill. 1991) (dismissing claim to rescind stock purchase agreement—the price of which was based on incorrect figures—because "the alleged mistake in calculating the purchase price [was] not sufficiently 'material' to warrant the rescission of all terms of the contract[ ] [as] [t]he alleged mistake did not go to the purpose of the contract but merely to one particular term."). Instead, the alleged mutual mistake goes to the value of the deal from D'Orazio's perspective, which is not enough to support a rescission claim. See *Diedrich*, 39 Ill. App. 3d at 859 (dismissing rescission claim because "plaintiff received the property for which it contracted," and explaining that the fact "that it may be of less value than the purchaser expected at the time of the transaction is not a sufficient basis for the granting of equitable relief[.]"). For all of these reasons, Count IV is dismissed.

**V.      Conclusion**

For the reasons set forth above, the Court grants in part and denies in part the parties' motions to dismiss. As to D'Orazio's motion to dismiss the amended complaint [15], the Court grants the motion with respect to Counts I through V and X; the Court denies the motion with respect to Count IX (the common law fraud claim). As to Boyd's motion to dismiss D'Orazio's amended counterclaim [53], the Court dismisses all of the claims at issue, with the exception of subsection (a) of Count III, which alleges that Boyd breached the PSA by failing to deliver its

WIP Adjustment in a timely manner.  The foregoing claims are dismissed without prejudice.  If the parties believe that they are able to amend their pleadings to state valid claims, they may do so within 28 days of the date of this order.

Dated: May 29, 2015

_____
Robert M. Dow, Jr.
United States District Judge