**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| THE BOYD GROUP (U.S.), INC., | ) | |
| | ) | |
| Plaintiff, | ) | 1:14-cv-7751 |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | Magistrate Judge Susan E. Cox |
| ROGER A. D'ORAZIO, JR. | ) | |
| | ) | |

## Order

For the reasons discussed more fully below, Plaintiff's Consolidated Motion to Compel [Dkt. 90] is granted in part and denied in part. Defendant Roger A. D'Orazio, Jr. ("D'Orazio"), is ordered to obtain and produce the documents in possession of Richard Miller and Richard Hagen within 7 days of this order. The motion is denied as it relates to documents in possession of R.J. D'Orazio or D'Orazio Capital Management, Inc. The motion is granted as it relates to the server discussed in the parties' briefs, to the extent that D'Orazio is able to locate that server. Assuming that D'Orazio cannot locate that server, the motion for spoliation sanctions is denied without prejudice, because this Court cannot ascertain the issues relating to prejudice, or the appropriate sanctions in light of that prejudice, until Plaintiff has exhausted its remaining avenues for discovery.

### I.  Background

#### A.  Case Overview

This case arises from the Purchase and Sale Agreement ("PSA") entered into by Plaintiff Boyd Group (U.S.), Inc. ("Boyd"), when Boyd purchased Dora Holdings, Inc. ("Dora Holdings") and its subsidiary companies, including Collision Revision, Inc. ("CRI"), from D'Orazio.

1

D'Orazio founded CRI in 1976, eventually expanding the business to include 29 production facilities and 6 satellite offices. According to D'Orazio, he stopped being involved in the day-to-day management of CRI in approximately 2005, and was replaced by his son, Roger A. D'Orazio III ("R.J."), and his uncle, Fiore D'Orazio ("Fiore"). Dora Holdings was founded in 2008, and served as the parent company for CRI and other business ventures purchased or pursued by the D'Orazio family. D'Orazio was the sole shareholder of Dora Holdings, but claims that R.J. managed and ran the company with virtually no oversight from D'Orazio.

In anticipation of the PSA being executed, D'Orazio sold all of the assets held by Dora Holdings other than the shares of CRI to R.J. This left Dora Holdings and CRI as the assets to be sold to Boyd, and the remainder of the business ventures pursued by Dora Holdings in the hands of the D'Orazio family. Then, on February 24, 2014, approximately two months before the PSA was signed, D'Orazio engaged in three separate transactions to effectuate the desired transfer: 1) Dora Holdings transferred all of its non-CRI assets to D'Orazio Capital Management, Inc. ("DCM"), a newly-minted, wholly-owned subsidiary of Dora Holdings; 2) Dora Holdings then transferred all ownership in DCM to D'Orazio; and 3) D'Orazio transferred all ownership of DCM to R.J.

The PSA closing between Boyd and Dora Holdings/CRI took place on April 14, 2014. Boyd alleges that D'Orazio and his employees assured Boyd that they had almost finalized a release from a supply contract with Sherwin-Williams during the time leading up to the PSA. However, on the day of the closing, D'Orazio had failed to secure the release from Sherwin-Williams, and D'Orazio agreed to set aside $4.2 million from the PSA purchase price to obtain the release after the closing. D'Orazio never obtained that release, and, as a result, Boyd was forced to negotiate a release on its own that cost far more than $4.2 million, which is the

underlying basis of the instant suit.

## B. The Dora Holdings Email Server

The first issue raised by Boyd in the instant motion is the location and production of a Dora Holdings email server that has not yet been produced in this litigation. Both parties agree that, until 2012, email addresses for domain names associated with both Dora Holdings (*i.e.*, "@doraholdings.com") and CRI (*i.e.*, "@collisionrevision.com") were hosted on an email server that was maintained by CRI. In 2012, the Dora Holdings emails were taken off that email server. The parties' descriptions of the reason for this transfer, and the manner in which it occurred, diverge almost completely.

Boyd asserts that the Dora Holdings emails were taken off the CRI server in 2012 when D'Orazio "decided it would be prudent to take control of the Dora Holdings email server away from CRI" because D'Orazio was in discussions to sell CRI to Fiore, who was an officer of CRI at the time. (Dkt. 91 at 4.) A Dora Holdings employee named Heather Vance attempted to execute the transfer, but a technical problem occurred, and Fiore was called in to fix the problem at R.J.'s behest. (Cusimano Decl. at ¶ 5.) Ultimately, the Dora Holdings email server was moved to an "Office 365" server within the control of D'Orazio; Boyd is unaware of the location of that server, and D'Orazio has not produced the server. (*Id.* at ¶¶ 7-8.)

According to D'Orazio, he was told by Fiore and R.J. in 2012 that Dora Holdings's emails were going to be moved to a cloud-based server (presumably, as opposed to a physical service housed in Dora Holdings' or CRI's offices). In order to avoid disruption of his email service, D'Orazio instructed R.J. and Fiore to leave his email accounts on the CRI servers, and neither of them ever told him that his emails had been moved to a different server. Therefore, as far as D'Orazio knew, the emails were still on the CRI server. D'Orazio assumed that his access

3

to the Dora Holdings and CRI email accounts would be cut off following the execution of the PSA, and asked that R.J. set up a Gmail account for D'Orazio. Both parties agree that D'Orazio stopped using his Dora Holdings email account, at the latest, around October 2014, when Boyd initiated the instant suit. Boyd suggests that this was not a coincidence, implying that D'Orazio went radio silent when the litigation commenced. Meanwhile, D'Orazio contends that he simply lost access to the email accounts, as he had anticipated.

In the course of discovery, Boyd has learned that it has no access to any Dora Holdings emails after 2012. Needless to say, emails from the Dora Holdings email account after 2012 – particular the emails from early 2014 surrounding the DCM transfer and the PSA – are highly pertinent to this suit. While D'Orazio initially claimed that Boyd already had possession of the relevant server because it had been turned over as part of the PSA. When Boyd confirmed that it did not have the server, D'Orazio claimed to have no knowledge of the server's whereabouts.

D'Orazio claims that, upon being served the summons in this matter, he made note of his three email accounts – Dora Holdings, CRI, and Gmail – and has not deleted any emails from those accounts. He further states that he was under the impression – both from implicit actions and direct statements of R.J. and Fiore – that his Dora Holdings email account was, at all times, hosted on the CRI server and, therefore, in Boyd's possession. D'Orazio claims to have no knowledge regarding the location of the Dora Holdings emails or what server currently houses them. Boyd seeks an order compelling D'Orazio to produce the Dora Holdings server, or an order for sanctions due to spoliation of evidence on the part of D'Orazio.

### C. The Third Parties

Boyd also seeks to compel D'Orazio to collect and produce the "working files an emails created on his behalf by his agents." (Dkt. 91.) In particular, Boyd seeks documents belonging

4

to Richard Hagen ("Hagen"), Richard Miller ("Miller"), R.J., and DCM. Hagen worked as the President of Dora Holdings until February 2014, when he left Dora Holdings to become the President and Chief Financial Officer of DCM. According to Boyd, Hagen served as the primary advisor to D'Orazio and negotiated many of the aspects of the PSA on D'Orazio's behalf. Boyd further contends that Hagen continued to act as D'Orazio's personal attorney and agent in connection with the Dora Holdings sales for several months after the PSA was executed.

Miller served as General Counsel for Dora Holdings, and also left that company in February 2014 for DCM, where he served as General Counsel as well. Boyd also contends that Miller acted as D'Orazio's agent in negotiating the PSA, and continued to provide D'Orazio legal advice regarding the sale after Miller because working for DCM.

R.J. was an employee of Dora Holdings, and, as noted above, purchased DCM from his father in February 2014; he currently serves as the owner and CEO of DCM. Boyd asserts that R.J. served as D'Orazio's agent in the months preceding and following the PSA transaction, negotiating on D'Orazio's behalf and helping him develop strategy. Boyd has served third party subpoenas on Hagen, Miller, and R.J., but has not served any such subpoenas on DCM.

## II. Discussion

### A. Documents In The Possession of Third Parties

Pursuant to Federal Rule of Civil Procedure 34(a)(1), a party may serve a request for the production of documents that are in another party's "possession, custody, or control." Frequently, "[t]he concept of 'control' is very important in applying the rule, but the application of this concept is often highly fact-specific." 8B Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *Federal Practice and Procedure* § 2110 (3d ed. 2010). "It is 'well-settled that a party need not have actual possession of the documents to be deemed in control of them;'

rather the 'test is whether the party has a legal right to obtain them.'" *Dexia Credit Local v. Rogan*, 231 F.R.D. 538, 542 (N.D. Ill. 2004) (quoting *In re Folding Carton Antitrust Litig.*, 76 F.R.D. 420, 423 (N.D. Ill. 1977)). Parties have the legal right to obtain documents from their former attorneys. *See Marshall v. Town or Merrillville*, 2015 WL 4232426, at *7 (N.D. Ind. July 13, 2015); *see also Avery Dennison Corp. v. UCB Films PLC*, 1998 WL 293002, at *2 (N.D. Ill. May 28, 1998). However, the Seventh Circuit is very clear that the issue of control turns on the *legal right* of the party to demand document production from a third party; "the fact that a party could obtain a document if it tried hard enough and maybe if it didn't try hard at all does not mean that the document is in its possession custody or control; in fact it means the opposite." *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993).

1. **Hagen and Miller**

Based on this review of the case law, it appears clear that D'Orazio has control over the relevant documents currently in possession of Hagen and Miller. D'Orazio does not argue that Miller and Hagen previously served as his attorneys, or that they have possession over the documents sought by Boyd. Instead, D'Orazio, relying on *Hobley v. Burge*, 433 F.3d 946 (7th Cir. 2006), argues that Rule 34 is the improper vehicle to seek the documents in the possession of Hagen and Miller, and that Boyd's only avenue for seeking these documents is enforcing third party subpoenas pursuant to Rule 45.

However, *Hobley* is easily distinguishable from the instant suit, and does not stand for the proposition that parties are not in control of documents that are possessed by their former attorneys. In *Hobley*, the plaintiff sued the City of Chicago pursuant to 42 U.S.C. § 1983 for torturing and framing him for arson after it came to light that one of the police officers allegedly involved had been fired from the Chicago police force for allegedly torturing a confession from a

6

murder subject. *Id.* at 947. Several months before the § 1983 suit was filed, an attorney from the city's Corporation Counsel contacted Jones Day, who had represented the city in the police board proceedings that led to the officer's dismissal, and told Jones Day that a special prosecutor was investigating allegations of torture by the Chicago police, and a grand jury had subpoenaed documents from the aforementioned police board proceedings. *Id.* Jones Day then sent 52 boxes of documents to Hinshaw & Culbertson (who was representing the city at the time), and informed Hinshaw & Culbertson that it was retaining 5 additional boxes based on the attorney work-product doctrine. *Id.*

The plaintiff then sued the city, and requested all of the police board documents; the city produced the 52 boxes of documents without telling the plaintiff about the other 5 boxes withheld by Jones Day, or informing Jones Day about the plaintiff's law suit and discovery requests. *Id.* at 948. Approximately two months later, the city finally disclosed the boxes that had been withheld by Jones Day, and the presiding magistrate judge found that those boxes were encompassed by the discovery requests and "ordered that they be produced pronto." *Id.* Jones Day then filed appearances, and sought reconsideration of the magistrate judge's discovery order, but the magistrate judge sanctioned Jones Day, finding that it had waived privilege over those documents and ordering them to be produced. On appeal, the Seventh Circuit vacated the discovery order, reasoning that the magistrate judge's use of Rule 34 to impose sanctions and discovery obligations on Jones Day was improper because Rule 34, by its plain terms, applies only to parties, and Jones Day was not a party to the law suit. *Id.* at 950.

It is not particularly difficult to figure out why the *Hobley* case does not apply to D'Orazio. Notably, the Seventh Circuit never held that the city, as the party in that case, lacked control over the boxes in Jones Day's possession, or that the city had no obligation to retrieve

7

and produce those documents, to the extent they were not protected by some other privilege. Instead, the Seventh Circuit reached the uncontroversial conclusion that Jones Day was not a party to the litigation, and, therefore, was not subject to sanctions imposed pursuant to Rule 34.

In this case, however, D'Orazio is a party to the litigation, and is clearly subject to the discovery requirement imposed by Rule 34. As such, he must produce any documents that are in his possession, custody, or control. As a former client of Hagen and Miller, D'Orazio has a legal right to demand that they turn over legal documents generated during their representation; in other words, he has control over those documents. Therefore, D'Orazio is ordered to obtain the relevant documents from Hagen and Miller and produce all non-privileged documents within 7 days of this order.

    **2.    R.J. and DCM**

With regard to DCM and R.J., this Court cannot say that the documents currently in their possession are in D'Orazio's control. This case presents something of a unique fact pattern. The issue of "control" often arises when determining whether a corporate entity has control over documents that are in the possession of former or current employees, subsidiaries, or foreign sister corporations. *See, e.g., Japan Halon Co., Ltd. v. Great Lakes Chemical Corp*, 155 F.R.D. 626 (N.D. Ind. 1993) (parent-subsidiary); *In re Folding Carton*, 76 F.R.D. at 423 (former employees); *Advance Labor Serv., Inc. v. Hartford Acc. & Indem. Co.*, 60 F.R.D. 632 (N.D. Ill. 1973) (sister corporations). It is rare that a motion to compel is sought against a former officer individually arguing that that individual has control over other former officers and agents of corporations with which he is no longer affiliated.

From a practical standpoint, D'Orazio might have the ability to seek and obtain the documents from R.J. R.J. is D'Orazio's son, and they appear to have had a close business

relationship over the years. However, the issue of control turns on the *legal right* to obtain documents, not the practical ability to do so. As the Seventh Circuit has noted, it is not enough that D'Orazio could get the documents if he tried hard enough; he must have the legal right to demand them, and if he does not, the proper vehicle for Boyd to retrieve those documents is a third party subpoena pursuant to Rule 45. Boyd has not cited any case law that suggests that D'Orazio has a legal right to obtain documents that are in R.J.'s possession.[1] Therefore, D'Orazio does not have control over those documents and the motion to compel is denied as to those documents.

Similarly, D'Orazio lacks control over the DCM documents. DCM is a corporate entity over which D'Orazio has no control. D'Orazio's involvement with DCM is limited to a series of contemporaneous transactions that led to R.J. having sole ownership of the company. Boyd asserts that D'Orazio, Hagen, Miller, and R.J. "disregarded [DCM's] corporate form and used the company as an extension of D'Orazio's interests both before and after D'Orazio sold the company to his son," but fails to provide any citation to the record or affidavit that would support that statement at all. (Dkt. 91 at 14.) Without more, the Court cannot say that D'Orazio has "control" over the documents belonging to DCM. As such, the motion to compel is denied with respect to the documents possessed by DCM.

### B. The Dora Holdings Email Server

Regarding the server that the parties have been unable to locate, Boyd asks for two forms of relief: 1) an order compelling D'Orazio to produce the server; or, in the alternative, 2) an order sanctioning D'Orazio for spoliation of evidence. D'Orazio denies any knowledge of the server's whereabouts or what happened to the server after 2012. Needless to say, if D'Orazio is

---

[1] Boyd, as the party seeking the documents, has the burden of proving that D'Orazio has control over the documents. *Sparks Tune-Up Centers, Inc. v. Panchevre*, 1991 WL 101667, at *3 (June 4, 1991) ("[T]he party which brings the motion to compel has the burden of establishing that the non-movant has control of the requested documents").

able to locate the server, he should produce it forthwith, and is hereby ordered to do so.

The more difficult question is regarding spoliation, which requires a showing of: 1) a duty to preserve evidence; 2) breach of that duty; 3) the breach occurred as a result of "willfulness, bad faith, or fault;" 4) prejudice to the other party; and 5) an appropriate sanction can ameliorate that prejudice. *MacNeil Auto. Prods., Ltd. v. Cannon Auto. Ltd.*, 715 F. Supp. 2d 786, 800 (N.D. Ill. 2010).

At this point, even if this Court could find that D'Orazio willfully breached his duty to preserve evidence after an evidentiary hearing – an issue which this Court does not reach here – the issue of prejudice and appropriate sanctions remain a moving target. This Court has ordered production of the documents currently in possession of Miller and Hagen, and R.J. and DCM may very well still have to produce their documents pursuant to subpoenas under Rule 45. It is entirely possible that all of the relevant communications will be produced through these alternative avenues. If that were the case, the prejudice to Boyd would be diminished, and the corresponding sanction, if any, would also be lessened. On the other hand, if the documents cannot be located through third parties, and Boyd is able to prove the remaining elements, Boyd may be severely prejudiced, and the appropriate sanction may be harsher. However, at this point, it is premature for this Court to rule on the spoliation issue raised in Boyd's instant motion. As such, the motion is denied without prejudice, and Boyd may file another spoliation motion once the remaining sources of discovery are mined for relevant documents. A status hearing is hereby set for September 24, 2015, at 9:30 a.m., to discuss how discovery will proceed moving forward, potential supplemental information that the Court will need to determine spoliation issues, and any other discovery items the parties wish to bring to the Court's attention at that time.

# CONCLUSION

For the foregoing reasons, Boyd's Consolidated Motion to Compel is granted in part and denied in part. D'Orazio is ordered to obtain and produce the documents in possession of Miller and Hagen within 7 days of this order. The motion is denied as it relates to documents in possession of R.J. D'Orazio or DCM. The motion is granted as it relates to the server, to the extent that D'Orazio is able to locate the server. Assuming that D'Orazio cannot locate the server, the motion for spoliation sanctions is denied without prejudice, because this Court cannot ascertain issues relating to prejudice, or the appropriate sanctions in light of that prejudice, until Boyd has exhausted its remaining avenues for discovery.

**ENTERED:**

**DATED:** September 11, 2015

Susan E. Cox
United States Magistrate Judge